UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| MARC ALEXANDER,<br>　　*Petitioner*,<br><br>　　　*v.*<br><br>UNITED STATES OF AMERICA,<br>　　*Respondent.* | Criminal No. 3:16-cr-00073 (JBA)<br><br>September 12, 2022 |

**ORDER OF RESTITUTION**

　　The Second Circuit vacated the Court's July 26, 2018 restitution order [Doc. # 386] and remanded the case for further proceedings as to restitution, otherwise affirming the judgments of April 17, 2017 and February 23, 2018. (*See* Mandate [Doc. # 443].) In lieu of a *Fatico* hearing, the parties agreed to adopt the factual findings from Defendant Marc Alexander's co-defendant Rachael Alexander's *Fatico* hearing and brief their arguments based on an interpretation of the facts established. (Mot. to Cancel Hr'g [Doc. # 454].) Defendant concedes his restitution liability for the car title-washing scheme in the amount of $205,330.67—the loss amount of seven cars he admits the Government established his liability for, minus the fair market value of each car—but disputes his obligation to pay restitution on four remaining cars that the Government claimed were part of the title-washing scheme. (Mem. of Law in Support of Marc Alexander's View of the Restitution for Which He is Accountable ("Def.'s Mem.") [Doc. # 467].) The Government contends that Defendant's restitution value should remain set at $310,738.929 based on the findings at Rachael Alexander's *Fatico* hearing. (Government's Re[p]ly To Def.'s Mem. of Law concerning Res[t]i[t]ution ("Gov't.'s Mem.") [Doc. # 475].)

　　For the reasons set forth below, the Court orders restitution in the amount of $310,738.929 for the title-washing scheme, to be paid joint and severally with Rachael

1

Alexander in addition to the unchallenged restitution amount of the postal order scheme, $313,570.00, for a total of $624,308.92.

## I.  Factual Background

Defendant pled guilty to conspiracy to commit mail fraud and wire fraud. (*See* J. [Doc. # 200] at 1.) He was sentenced to 96 months imprisonment and ordered to pay $310,738.92 restitution for the title-washing fraudulent scheme (Count 14) and $313,570.00 for the postal order fraud (Count 1) for a total of $624,308.92. (*See id.*; Restitution Order as to Marc Alexander and Rachael Alexander [Doc. #386].) Restitution was ordered based on the evidence offered by the Government at Rachael Alexander's *Fatico* hearing; the Court excluded the value of six cars which it considered "outside th[e] scope" of the specific scheme charged and calculated total restitution for the title-washing scheme using only cars that were actually title washed, (*Fatico* Hr'g Tr. Day II ("*Fatico II*") [Doc. # 407] at 116.) Defendant appealed both the judgment and restitution amount. The Second Circuit affirmed the judgment but remanded the restitution issue for further proceedings as to Defendant, who was not provided with "the requisite opportunity to present his position prior to entering the restitution order." (Mandate at 7.)

Accordingly, the Court scheduled a *Fatico* hearing to take place on November 9, 2020. (*See* Scheduling Order [Doc. # 447].) Several weeks later, Defendant filed a consent motion to cancel the *Fatico* hearing, representing that "the evidence of the cars at issue in this case and their value" is already on the record, "neither party wishes to introduce any further evidence or conduct any further questioning of witnesses" and "the amount of restitution for which Marc Alexander is accountable turns on legal issues as applied to the evidence" established at Rachael Alexander's *Fatico* hearing and one additional affidavit from Defendant's expert on the fair market value of two cars. (Mot. to Cancel Hr'g [Doc. # 454] at 1-2.) The Court then set a briefing schedule for the Parties to make their arguments regarding the restitution for which Defendant should be responsible. (*See* Order Granting

Proposed Briefing Schedule [Doc. # 466].) After receiving the briefing and holding a status conference, the Court asked both parties to submit supplemental briefing on the application of *United States v. Smith*, 513 F. App'x 43 (2d Cir. 2013). (*See* Minute Entry: Telephonic Status Conference as to Marc Alexander held 6/3/2021.) The briefing was concluded on June 22, 2021.

## II. Discussion

The Mandatory Victims Restitution Act requires sentencing courts to order defendants convicted of certain crimes to "make restitution to the victim of the offense," which includes "in the case of an offense that involves as an element a scheme, conspiracy, or pattern of criminal activity, any person directly harmed by the defendant's criminal conduct in the course of the scheme, conspiracy, or pattern."  18 U.S.C. § 3663A(a)(1)-(2). District courts may impose restitution for the "reasonably foreseeable acts of all co-conspirators" and "[w]here . . . a conspiracy has multiple victims, the [MVRA] allow[s] the sentencing court to order a single defendant to pay restitution for all losses caused by the actions of the defendant as well as by the actions of that defendant's co-conspirators, or, in its discretion, to allocate restitution proportionally among culpable parties." *United States v. Boyd*, 222 F.3d 47, 50 (2d Cir. 2000). *Boyd* explained that a district court can properly rely on *Pinkerton* liability to impose restitution making a defendant liable "for the reasonably foreseeable acts of all co-conspirators" because when the defendant is found liable for substantive crimes committed by co-conspirators under *Pinkerton*, that liability "subsumes the findings" needed for restitution as well. *See id.* at 51 (citing *Pinkerton v. United States,* 328 U.S. 640 (1946)). "An offense by a co-conspirator is deemed to be reasonably foreseeable if it is a necessary or natural consequence of the unlawful agreement." *United States v. Parkes*, 497 F.3d 220, 232 (2d Cir. 2007). The finder of fact may rely on circumstantial evidence in determining whether a particular act was reasonably foreseeable. *United States v. Graziano*,

616 F. Supp. 2d 350, 367 (E.D.N.Y. 2008) (citing *United States v. Ruiz*, 105 F.3d 1492, 1500 ( 1st Cir. 1997)).

Defendant characterizes the issue in dispute as "the identity of cars for which Mr. Alexander is accountable as a part of the title-washing fraud and the associated loss for which restitution should be ordered."[1] (Def.'s Mem. at 2.) Defendant concedes that he is accountable for seven title-washed cars: a Jeep Wrangler, a Nissan Altima, a Nissan Sentra, a Dodge Charger, a Chrysler 300, a Dodge Challenger, and a Mercedes Benz. (Def.'s Mem. at 9.) He disputes his liability on the remaining four cars: a 2013 BMW convertible (Car 1); a BMW 750Li Xdrive (Car 9); a 2008 Hummer (Car 16); and a 2014 Jeep Cherokee (Car 7). Although the Court found co-defendant Rachael Alexander accountable for all eleven cars that were subject to the title-washing fraud, Mr. Alexander maintains that "[t]he evidence . . . established Mr. Alexander's accountability for only seven of those eleven cars as part of the title-washing fraud." (*Id.* at 3-4.) Specifically, he argues that he can only be accountable for the acts or omissions of a co-conspirator if they were "reasonably foreseeable as part of jointly undertaken criminal activity." (*Id.* at 4.) He posits that since the Government failed to establish that "*all* of the title-washed cars were reasonably foreseeable to Mr. Alexander," he cannot be accountable for losses resulting from the title washing of all eleven cars.[2]

---

[1] It is not disputed that Defendant's restitution for postal order fraud "is no more than" $313,570. (Def.'s Mem. at 2.) In a footnote, Defendant argues that the true amount might be less based on genuine payments made by co-conspirators towards the amount payable on the stolen postal order to the payee. (*Id.*) However, Defendant concedes he does not have records to submit this theory. (*Id.*) Because Defendant offers no factual support for this contention and has already agreed to accept the record of Rachael Alexander's *Fatico* hearing as the record for purposes of determining his restitution, the Court declines Defendant's invitation to reduce the amount of restitution by some speculative, unspecified amount.

[2] Defendant also proposes his own restitution value for the seven cars he concedes responsibility for, which he states as the loss value minus the credits for the cars' fair market values. However, the restitution amounts were calculated at the *Fatico* hearing, and Defendant has agreed to limit himself to that record. At the hearing, the Government explained that it took into account that some of the vehicles were recovered and resold when calculating restitution. (*See Fatico* Hr'g Tr. Day I ("*Fatico I*") [Doc. # 407] at 79.) If Defendant wished to challenge the Government's valuations, he had the opportunity to do so at his

4

In response, the Government is silent as to any specific evidence demonstrating that the four contested title-washed cars were reasonably foreseeable losses to Mr. Alexander. Instead, it maintains that all the title-washed cars were categorically reasonably foreseeable because Mr. Alexander admitted to participating in a fraudulent title-washing conspiracy and the Presentence Investigation Report that the Court adopted the factual statements of states that Mr. Alexander participated in a title-washing conspiracy with his wife that included the four disputed cars. (Gov't.'s Mem. at 8.) The Government states that "[t]o argue that Marc Alexander participated in this fairly complicated scheme and is liable for some cars, but not others, strains credulity." (*Id.*)

The record from Rachael's *Fatico* hearing regarding each of the contested cars shows that all four cars were part of the title-washing scheme, and that the losses were at a minimum reasonably foreseeable to him, as detailed for each car below:

- Car 1, 2013 BMW 128i convertible: Kenneth Nelson, an employee of a car company that the Alexanders sold several title-washed vehicles to, testified at the *Fatico* hearing that "Rachael and her husband, Marc Alexander" came by with the BMW convertible to receive the check and go through with the transaction. (*Fatico I,* 53.) Detective Solomon testified that the car was sold after the title was washed for $21,500 that was deposited into "a Chase account belonging to Marc Anthony Luxury Rentals on February 29, 2016." (*Id.* at 120.) The Marc Anthony Luxury Rentals bank account had Marc Alexander on it, but not Rachael Alexander. (*Id.* at 104.) The title for the car was found in a safe at the "Oxford residence," at which Rachael and Marc both resided. (*Id.* at 120-121.)

---

scheduled *Fatico* hearing; because he has agreed that the factual record is the one used at Rachael's hearing, those values are the ones the Court will use.

- Car 9, BMW 750Li Xdrive: Detective Solomon testified that once the title to the car was washed, there was a transfer of ownership "listing Rachael as the seller of the vehicle and Marc Anthony now as the buyer of the vehicle."[3] (*Id.* at 124.)

- Car 16, 2008 Hummer: the title-washing documents for the Hummer were found "inside the Oxford residence" where the Alexanders lived, (*id.* at 133.), and the vehicle itself "was actually located on the Oxford property" as well. (*Id.* at 135.)

- Car 28, 2014 Jeep Cherokee: "Mr. and Mrs. Alexander were driving" this car on the day of their arrest, (*id.* at 25), and the documents for the title-washing were all found in the safe at the Alexander's Oxford residence. (*Id.* at 24.)

This record adequately establishes the reasonable foreseeability of losses associated with these vehicles to Mr. Alexander. Title documents for the cars were found in his home, title-washed cars were found in his driveway, and some of the illegal proceeds were deposited into a bank account that he—not Rachael Alexander—was the owner of. The Government was not required to provide direct evidence of Defendant's participation in or awareness of each individual title washing; the circumstantial evidence described above is sufficient to determine that the fraudulent title washing transactions with these four vehicles were reasonably foreseeable to Defendant. *See Graziano*, 616 F. Supp. 2d at 367.

In *Smith*, the Second Circuit considered a restitution order imposed on a defendant who participated in a conspiracy to steal credit card numbers. 513 F. App'x at 44. Although the defendant argued she should only face a restitution obligation "for the losses resulting from credit cards which she personally swiped," the district court found and the Second

---

[3] However, because the restitution for the car was separately awarded in a civil case between the Alexanders and the leasing company, it was excluded from the restitution calculation at the *Fatico* hearing and the Court does the same here. (*See id.* at 124-125.)

6

Circuit affirmed that the record reflected the defendant "was aware that her coconspirator was also stealing credit card information, making it reasonably foreseeable that the conspiracy would cause substantial losses to card holders" even for the cards she did not swipe. *Id.* at 45. "Because Smith was convicted of a *conspiracy* to commit access device fraud, the district court properly ordered restitution for all losses caused by Smith, as well as by the reasonably foreseeable actions of her coconspirators." *Id.*

Defendant attempts to distinguish *Smith* because the defendant had stipulated to a loss representing the scope of the conspiracy in her plea agreement, unlike Mr. Alexander. (*See* Letter Reply re: *Smith* ("Letter Reply") [Doc. # 482] at 1.) However, the reasoning in *Smith* turned on reasonable foreseeability, not the defendant's stipulation. Like the *Smith* defendant's awareness of the other perpetrators using the credit card skimmers and making fraudulent charges, Mr. Alexander admitted he was aware of the mechanics of and the participants in the title washing scheme, even if he did not have an individual role in each washing: "it was me and my co-conspirators purchased a number of cars with straw buyers in an effort to buy the cars and then wash the titles, and then resell the cars back to a different dealership. And there was a profit made that was split out through all co-conspirators." (*See* Change of Plea Hearing Tr. [Doc. # 240] at 43.) Moreover, his degree of separation from the conduct of his co-conspirator is, if anything, less than the defendant in *Smith*; Defendant fails to credibly explain how he could have been ignorant of the title-washing of the four contested vehicles in light of these circumstances, notwithstanding the testimony from J&M Automotive employee Kenneth Nelson that Rachael Alexander was the primary driver of the conspiracy. (*See* Def.'s Mem. at 6-7.) Even if Rachael took a lead role in facilitating the title washing, Nelson also testified that the Alexanders were almost always together when he met them to buy a title washed car—including the 2013 BMW convertible, which is one of the cars Defendant contests liability for. (*See Fatico I* at 46, 51, 53.)

7

Defendant cites *United States v. Rizzo* for the proposition that reasonable foreseeability must not be inferred, but instead supported by specific evidence in the record. (Def.'s Mem. at 5.) In *Rizzo*, the Second Circuit vacated the district court's application of an enhancement resulting from the finding that the defendant had participated in "jointly undertaken criminal activity that involved theft from the person of another." 349 F.3d 94, 96 (2d Cir. 2003). Although there was no evidence that the defendant had actually stolen documents from another person, the district court found that her use of stolen credit card and driver's license information amounted to "strong circumstantial evidence that there were thefts from the persons of others." *Id.* at 97. The Second Circuit found this finding was clearly erroneous because the Government "did not produce evidence that the defendant 'engaged in joint criminal activity'" and neither demonstrated "the existence of the unknown co-conspirators" or the defendant's complicity. *Id.* at 99. But *Rizzo* turns on the lack of evidence of a *conspiracy,* not reasonable foreseeability of losses from the defendant's actions, and does not provide guidance here where the existence of a conspiracy, the identity of the co-conspirators, and Defendants' awareness of their actions are established in the record. *See id.*

Defendant also cites *United States v. Palafox-Mazon* in support of his position that he should only be liable for title-washing of cars in which there is evidence of his personal involvement. 198 F.3d 1182 (9th Cir. 2000). In *Palofox-Mazon*, the Ninth Circuit affirmed the district court's finding that defendants, who were individually hired as "mules" to "transport individual backpacks of marijuana into the United States" could not be held liable for other mules' drug transports because "[n]one of the Defendants had any role in preparing or planning the importation of the marijuana" and were "simply given . . . backpack[s] and told to follow a guide . . . to an unknown destination, via an unknown route to the United States." *Id.* at 1184. The *Palafox-Mazon* situation is not analogous here, given Defendant admitted to participating in the title-washing conspiracy with his wife. Even if Defendant's wife was the

8

"ringleader" of the fraudulent scheme, Mr. Alexander admitted to having understood and participated in the scheme and was sentenced as an organizer/leader rather than a minor participant like the drug mules described in *Palafox-Mazon*.

### III.  Conclusion

There is no claim or evidence that Defendant had removed himself from participation in the conspiracy, and as discussed above, his responsibility for its losses has an adequate basis in the record to hold him responsible jointly and severally with Rachael Alexander for losses associated with the four disputed cars. Accordingly, RESTITUTION in the amount of $310,738.92 for the title-washing scheme and $313,570.00 for the postal order fraud, for a total of $624,308.92, is ordered.

        IT IS SO ORDERED.

        _____/s/_____

        Janet Bond Arterton, U.S.D.J.

Dated at New Haven, Connecticut:  September 12, 2022